1

2

3

4

5        IN THE UNITED STATES DISTRICT COURT

6        FOR THE NORTHERN DISTRICT OF CALIFORNIA

7

CONLEY E. DUKES,                    )        No. C 06-5741 JSW (PR)
                                    )
8              Petitioner,          )
                                    )
9                                   )        **ORDER DENYING PETITION FOR A**
       vs.                          )        **WRIT OF HABEAS CORPUS**
10                                  )
WARDEN ORNOSKI, SAN                 )
11     QUENTIN STATE PRISON,        )
                                    )
12             Respondent.          )
                                    )
13                                  )

14     _____

15                            **INTRODUCTION**

16          Petitioner Conley Dukes,  a prisoner of the State of California currently

17     incarcerated at San Quentin State Prison in San Quentin, California, filed a habeas

18     corpus petition pursuant to 28 U.S.C. § 2254 challenging the Board of Parole Hearings'

19     ("BPH") denial of parole during parole suitability proceedings in 2005.  This Court

20     ordered Respondent to show cause why a writ should not issue.  Respondent filed an

21     answer, memorandum and exhibits in support thereof.  Petitioner has filed a traverse.

22     For the reasons stated below, the petition is denied on the merits.

23                            **BACKGROUND**

24          On January 20, 1983, May 12, 1983 and July 28, 1983, in Santa Clara County

25     Superior Court, Petitioner was convicted of multiple counts of robbery, vehicle theft,

26     burglary, possession of stolen property and kidnapping for robbery. (Respondent's

27     Answer Exhibit (hereinafter "Answer Ex.") A.)  The trial court sentenced him to a term

28     of  twelve years, eight months to life in state prison.  (*Id*.)  Petitioner's minimum parole

eligibility date was June 27, 1997.  (Answer Ex. E, Subsequent Parole Consideration Hearing, at 1.)  In this habeas action, Petitioner does not challenge his conviction or sentence, but instead alleges that his due process rights were violated by the denial of parole by BPH during a subsequent parole suitability hearing on June 23, 2005.

At the hearing, the BPH relied, in part, upon the following account of Petitioner's commitment offenses excerpted from the California Court of Appeal opinion concerning the direct appeal of his conviction:

> On November 10, 1982 about one-thirty a.m., Edwin Cabral, answered a knock on his shop door, and defendants Dukes and Harbaugh, and one other [sic] forced their way into the shop.  Dukes was carrying a knife. The three pushed Cabral to the floor, and kicked and beat him, and demanded drugs and money.  They stole a cassette recorder, a small television, a wrist watch and four dollars from Cabal's pocket.  Cabral [sic] defendants several times in the weeks after the robbery in a photo lineup and later in a corporal lineup.  Cabral made positive identification of Dukes and more tentative identification of Harbaugh.  And positively identified both defendants at the preliminary hearing.

> On December 23, 1982, Clemente Jimenez and Alexandra Diaz were watching television when defendants knocked on the door.  Jimenez opened the door and Dukes[,] armed with a rifle, Harbaugh and the same accomplice carrying knives[,] rushed into the house.  Jimenez was forced to the floor with the rifle on his back.  He was tied up with electrical cord. The robbers got away with a small pocket knife and three dollars.

> On that same night about 10:35 p.m., the three men knocked on an Antonio Diaz and Teresa Cruises door just a few blocks from the scene of the previous robbery.  Diaz opened the door, Dukes and another carrying rifles.  The other man wielded a knife.  They rushed into the house, bound Diaz and stole his wallet, television, stereo, and car.

> Later that night at about 12:10 a.m., Manuello Torres and his cousin Rene Rodriguez received a knock on the door of their Milpitas home.  Rene opened the door and Harbaugh holding a knife and another male with a rifle barge in and demanded money.  They left with a stereo.

> Glen Clements testified that his home was broken into on December 16, 1982.  One of the items stolen was a 22-caliber rifle ceased [sic] from Dukes and Harbaugh at the time of their arrest.

> The subject of the second trial was the kidnapping, robbery of David Sanchez.  On December 15, 1982 at about 9:00 p.m., David Sanchez was sitting in his car in a parking lot in Sunnyvale.  A young woman approached the car and asked Sanchez for "a date".  [D]efendants Dukes and Harbaugh each carrying kitchen knives, came up behind the woman,

2

grabbed Sanchez by the hair and threatened him in the car.  The woman sat in the driver's seat with Sanchez in the middle and Dukes on the passenger side.  Harbaugh got in the back.  Defendants demanded money, and Sanchez gave them all his money, $45.  Dukes took Sanchez' necklace and watch and then handcuffed him.  Harbaugh pulled Sanchez['s] hair from behind and cut him near the right eye.  Harbaugh then grabbed Sanchez by the hair and pulled him face up into the seat.  They drove for about ten minutes, stopped, and the woman got out, went into a house and then returned and they resumed driving.  And then demanded more money and threatened to kill Sanchez.  After about forty minutes they stopped driving and Dukes pushed Sanchez out of the car and drove off.

(Answer Ex. A at 8-11.)

The BPH panel also considered Petitioner's extensive prior criminal history. Petitioner's record included an arrest for possession of a dangerous substance in 1968, commitment to the California Youth Authority (hereinafter "CYA") in 1969 for grand theft, burglary, violation of probation and escaping detention; recommitment to CYA in 1969 for violating probation and again commitment to CYA in 1973 for possession of marijuana. (*Id.* at 12-13).  The Presiding Commissioner noted one conviction in 1972 to which Petitioner plead guilty, as well as one arrest in 1974 and two theft arrests in 1975, on one of which Petitioner was convicted and sentenced to two years probation and 180 days in jail.  (*Id.* at 13-14).  In 1976, Petitioner suffered two arrests, one for burglary, receiving stolen property and forgery of a credit card, of which he was convicted and sentenced to four months in jail.  (*Id.* at 14).   In 1978, Petitioner was convicted of credit card forgery and sentenced to five months in jail.  (*Id.*)  In 1980, Petitioner was convicted of petty theft with a prior and sentenced to 4 months in jail.  (*Id.*)   In 1981, Petitioner was convicted of a theft offense and sentenced to 90 days in jail.  (*Id.*) Petitioner was subsequently arrested and charged with the life crimes.

The BPH panel considered Petitioner's social history, discussing his childhood with five brothers, his previous marriage resulting in two children, his third child born of a non-marital relationship and his history of drug abuse.  (Answer Ex. D at 17-20.) Petitioner testified that his abuse of heroin commenced when he was nineteen and that it

took over his life such that "you're not yourself anymore." (*Id.* at 20). Petitioner testified that his life was "a haze" during that period and that "you read down the crimes, I'm sure I did them, but I don't remember a lot of them." (*Id.*) During that time, Petitioner was living in motels and "robbing, stealing, whatever it took[]" to support his drug habit. (*Id.* at 20-21.) Petitioner testified that he attempted four or five drug rehabilitation programs, eventually completed one, but "just fell back off into drugs. After I, you know, got out of them." (*Id.* at 24.) Petitioner testified that he believes that he did not succeed in quitting drugs at the time because he wasn't serious about quitting, that he did not want to stop. (*Id.* at 25.)

Petitioner testified that he had three children, all of whom he was in contact with, as well as five grandchildren. (*Id.* at 22-23.) Petitioner's wife passed away of cancer during his incarceration and, although they remained legally married, they were otherwise separated. (*Id.* at 23.)

The Presiding Commissioner also discussed Petitioner's parole plans. Petitioner had plans to be paroled either to Santa Clara County to live with his mother-in-law and sister-in-law or, alternatively with his brother in Tuolumne County. (*Id.* at 26.) Petitioner provided support letters from his family, as well as several prospective employers (*Id.* at 27-30.)

The Presiding Board Member noted that there was a confidential letter from the victim in the file that would be considered, as well as a letter of opposition from Robert L. Davis, the Chief of Police of the San Jose Police Department. (*Id.* at 27.)

The Board also considered Petitioner's programming while incarcerated, including eight laudatory chronos for positive work performance from 1987 through 1991, 1993, 1994 to 1997 and 1999. (*Id.* at 32.) Petitioner also received two vocational certificates for safety and had tools in 1990 and 1991 respectively. (*Id.*) Petitioner has a lengthy work history, with "exceptional and above average" grades from 1993 to 1995,

4

but was placed on "C status" in 1996 for refusing to work and was "adversely unassigned" as a teacher's aide in 1997.  (*Id.* at 33.)  From 1999 to 2000, Petitioner's work grades ranged from unsatisfactory to satisfactory and he was "unassigned" from late 2001 to early 2003 due to placement in administrative segregation.  (*Id.*)  Petitioner's grades since then have been satisfactory and above and he has been working since February 2003 as a "PIA machine operator."  (*Id.*)   In addition to a number of therapy and self-help groups, Petitioner has a certificate for 24 months of regular attendance in AA starting in January, 2003.  (*Id.* at 33-34.)

The Board also considered Petitioner's disciplinary history while incarcerated which includes at least 13 serious disciplinary findings, many of which are for possession of contraband, the last of which was for manufacturing alcohol in February, 1997.  (*Id.* at 35.)   Petitioner also had at least 7 disciplinary "128(a)'s" over the period of 1985 through 2001.  (*Id.*)   Petitioner's psychological evaluation noted that Petitioner told the examiner that he was "getting too old" for a life of crime and addiction and that Petitioner currently poses little safety risk in the community "of course, contingent on remaining clean and sober from substance abuse."  (*Id.* at 36-37)   Dr. Bachland, who authored the report, noted that Petitioner, like "some antisocial personalities," has apparently matured out of his earlier antisocial ways.  (*Id.* at 37.)

Petitioner was questioned by the Presiding Commissioner about his history of drug use within the prison system and what changed in 1997, when Petitioner suffered his last disciplinary finding for drug use.  (*Id.* at 38.)   Petitioner testified that he was "[j]ust tired of playing games in the yards, and I know if I was to get out, and if I used yesterday in here, I'm going to do the same thing out there."  Petitioner testified that he has been "going steady" to AA since 2001.  (*Id.* at 40.)   Petitioner was questioned about a psych report from 2003 that noted that he had "taken a somewhat passive stance" regarding obtaining a parole date and "takes a somewhat cavalier attitude about his drug

abuse problem, not feeling that he is in any particular risk of" relapsing.  (*Id.* at 40-42.)
In response, Petitioner testified that he is "sincere about living the rest of my life
selectively[,]" that he'll do "whatever it takes" and that he started working on the steps in
2003, "two years ago when I started this program."  (*Id.* at 44-45.)

Santa Clara Deputy District Attorney Ronald Rico stressed his opposition to
parole, noting that Petitioner was 29 at the time of the life crimes, that he still lacks
insight about the crimes he committed as well as about himself, perhaps due to his
continued drug use while incarcerated.  (*Id.* at 49-50.)  He also noted the relatively short
period during which Petitioner appears to have committed himself to his recovery and
that Petitioner's apathy shows an insufficient foundation to support Petitioner's release
from prison.  (*Id.* at 52.)

After a recess to consider the evidence, the BPH found that Petitioner was "not
suitable for parole and would pose an unreasonable risk of danger to society, or a threat
to public safety, if release[d] from prison.  (*Id.* at 56.)  This determination was based on
the callousness of Petitioner's commitment offense, that it was not the only offense for
which he is serving his life sentence, that the motive for the crime was very trivial, and
that Petitioner had an escalating pattern of criminal conduct. (*Id.* at 57.)  The Presiding
Commissioner noted that Petitioner has a significant arrest history and that he had failed
society's previous attempts to correct his criminality.  (*Id.* at 58.)   The Presiding Board
Member further found that Petitioner had programmed in a somewhat limited manner,
noting that Petitioner had failed to complete a vocation and had not sufficiently
participated in self help programs.  (*Id.*)  With regard to this finding, the Commissioner
discussed Petitioner's extensive prior prison disciplinary record and several recent psych
reports that reflected Petitioner's lack of motivation or adequate insight to address his
drug problem.  (*Id.* at 59-60.)

The Presiding Commissioner acknowledged that Petitioner has parole plans and

job offers, but stated, "The panel finds that the inmate needs to be [sic] participate in self-help in order to understand and cope with stress in a non-destructive manner in order to build tools for successful parole. (*Id.* at 61.)   The Board denied parole for two years, based on the commitment offense, the trivial motive for the crime, Petitioner's extensive history of criminality and misconduct, as well as his unstable relationships and insufficient insight and empathy. (*Id.* at 62-63.)

Petitioner challenged the Board's decision in Santa Clara County Superior Court, which denied his claims in a reasoned opinion on May 26, 2006. (Answer Ex.H.)  The California Court of Appeal for the Sixth Appellate District and the California Supreme Court summarily denied Petitioner's habeas petition on June 30, 2006 and August 23, 2006, respectively. (Answer Ex. L & H.)  Thereafter, Petitioner filed the instant federal petition for a writ of habeas corpus on September 19, 2006.

## DISCUSSION

A.   Standard of Review

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), codified under 28 U.S.C. § 2254, provides "the exclusive vehicle for a habeas petition by a state prisoner in custody pursuant to a state court judgment, even when the petitioner is not challenging his underlying state court conviction." *White v. Lambert*, 370 F.3d 1002, 1009-10 (9th Cir. 2004).  Under AEDPA, this Court may entertain a petition for habeas relief on behalf of a California state inmate "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

The writ may not be granted unless the state court's adjudication of any claim on the merits: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable

determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). Under this deferential standard, federal habeas relief will not be granted "simply because [this] court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Williams v. Taylor*, 529 U.S. 362, 411 (2000).

While circuit law may provide persuasive authority in determining whether the state court made an unreasonable application of Supreme Court precedent, the only definitive source of clearly established federal law under 28 U.S.C. § 2254(d) is in the holdings (as opposed to the dicta) of the Supreme Court as of the time of the state court decision. *Williams*, 529 U.S. at 412; *Clark v. Murphy*, 331 F.3d 1062, 1069 (9th Cir. 2003).

In determining whether the state court's decision is contrary to, or involved an unreasonable application of, clearly established federal law, a federal court looks to the decision of the highest state court to address the merits of a petitioner's claim in a reasoned decision. *LaJoie v. Thompson*, 217 F.3d 663, 669 n.7 (9th Cir. 2000). If the state court only considered state law, the federal court must ask whether state law, as explained by the state court, is "contrary to" clearly established governing federal law. *See, e.g., Lockhart v. Terhune*, 250 F.3d 1223, 1230 (9th Cir. 2001); *Hernandez v. Small*, 282 F.3d 1132, 1141 (9th Cir. 2002) (state court applied correct controlling authority when it relied on state court case that quoted Supreme Court for proposition squarely in accord with controlling authority). If the state court, relying on state law, correctly identified the governing federal legal rules, the federal court must ask whether the state court applied them unreasonably to the facts. *See Lockhart*, 250 F.3d at 1232.

B.    Legal Claims and Analysis

Petitioner claims that his due process and equal protection rights under the Fifth

and Fourteenth Amendments were violated by BPH's denial of parole without "real evidence" that he is a threat to public safety. Petitioner also claims that the Board did not properly weigh the evidence and that it improperly relied on the "some evidence" standard in determining whether Petitioner should be found suitable for parole.

       1.    The Federal Right to Due Process in California Parole Hearings

California's parole scheme provides that BPH "shall set a release date unless it determines that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration for this individual, and that a parole date, therefore, cannot be fixed at this meeting." Cal. Penal Code § 3041(b). In making this determination, the BPH considers an expansive list of factors including: the prisoner's social history, the commitment offense and prior criminal history, his behavior before, during and after the crime and "any other information which bears on the prisoner's suitability for release." *See* Cal. Code Regs. tit. 15, § 2402(b) – (d). The regulations specifically include as factors tending to support unsuitability for parole: whether the commitment offense was committed in an especially heinous, atrocious or cruel manner; a prisoner's previous record of violence; an unstable social history; psychological factors; and institutional behavior. Cal. Code Regs. tit. 15, § 2402(c). The regulations specifically include as factors tending to support suitability for parole: no juvenile record; stable social history; signs of remorse; stress-related motivation for the crime; lack of criminal history; age; understanding and plans for the future; and institutional behavior. Cal. Code Regs. tit. 15, § 2402(d).

California's parole scheme "gives rise to a cognizable liberty interest in release on parole" which cannot be denied without adequate procedural due process protections. *Sass v. California Bd. of Prison Terms*, 461 F.3d 1123, 1127 (9th Cir. 2006) (*quoting McQuillion v. Duncan*, 306 F.3d 895, 902 (9th Cir. 2002)). The determination does not

depend on whether a parole release date has ever been set for the prisoner because "[t]he liberty interest is created, not upon the grant of a parole date, but upon the incarceration of the inmate." *Biggs v. Terhune*, 334 F.3d 910, 914-15 (9th Cir. 2003).

Due process requires that "some evidence" support the parole board's decision finding the prisoner unsuitable for parole. *Sass*, 461 F.3d at 1128 (holding that the "some evidence" standard for disciplinary hearings outlined in *Superintendent v. Hill*, 472 U.S. 445, 454-55 (1985), applies to parole decisions in a section 2254 habeas petition); *Biggs*, 334 F.3d at 915 (same); *McQuillion*, 306 F.2d at 904 (same).  The "some evidence" standard is minimally stringent and ensures that "the record is not so devoid of evidence that the findings of [the parole board] were without support or otherwise arbitrary." *Hill*, 472 U.S. at 457.  Determining whether this requirement is satisfied "does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence." *Id.* at 455 (quoted in *Sass*, 461 F.3d at 1128).

Due process also requires that the evidence underlying the parole board's decision have some indicia of reliability.  *Biggs*, 334 F.3d at 915; *McQuillion*, 306 F.3d at 904. Relevant to this inquiry is whether the prisoner was afforded an opportunity to appear before, and present evidence to, the parole board.  *See Pedro v. Oregon Parole Bd.*, 825 F.2d 1396, 1399 (9th Cir. 1987).  In sum, if the parole board's determination of parole unsuitability is to satisfy due process, there must be some evidence, with some indicia of reliability, to support the decision.  *Rosas v. Nielsen*, 428 F.3d 1229, 1232 (9th Cir. 2005).

When assessing whether a state parole board's suitability determination was supported by "some evidence," the court's analysis is framed by the statutes and regulations governing parole suitability determinations in the relevant state.  *Irons v. Carey*, 505 F.3d 846, 851 (9th Cir. 2007).  Accordingly, in California, the court must

10

look to California law to determine the findings that are necessary to deem a prisoner unsuitable for parole. *Id.*

The recent California Supreme Court case of *In re Lawrence*, 44 Cal.4th 1181 (2008), clarified what California law requires the parole board to find in order to deny parole: The board must find only that the prisoner is a current threat to public safety, not that some of the specific factors in the regulations have or have not been established. *Id.* at 1212. This means that the "some evidence" test is whether there is "some evidence" that the prisoner is a threat, not whether there is "some evidence" to support particular secondary findings of the parole board, for instance that the prisoner needs more time for rehabilitation. *Id.*; *see Irons*, 505 F.3d at 851 (when assessing whether a state parole board's suitability determination was supported by "some evidence," the court's analysis is framed by the statutes and regulations governing parole suitability determinations in the relevant state).

California law also clearly states that "the nature of the prisoner's offense, alone, can constitute a sufficient basis for denying parole." *In re Rosenkrantz*, 29 Cal. 4th 616, 682 (2002). However, "the denial of parole may be predicated on a prisoner's commitment offense only where the Board can 'point to factors beyond the minimum elements of the crime for which the inmate was committed' that demonstrate the inmate will, at the time of the suitability hearing, present a danger to society if released." *Irons*, 505 F.3d at 852 (citing *In re Dannenberg*, 34 Cal. 4th 1061, 1071 (2005)). The circumstances must show that "[t]he prisoner committed the offense in an especially heinous, atrocious or cruel manner[.]" Cal. Code Regs. tit. 15, § 2402(c)(1). But overall, the "circumstances of the crime reliably established by evidence in the record" must "rationally indicate that the offender will present an unreasonable public safety risk if released from prison" to justify a denial of parole on the basis of the commitment offense. *In re Scott*, 133 Cal. App. 4th 573, 595 (2005).

While "the parole board's sole supportable reliance on the gravity of the offense and conduct prior to imprisonment to justify denial of parole can be initially justified," over time, "should [a prisoner] continue to demonstrate exemplary behavior and evidence of rehabilitation, denying him a parole date simply because of the nature of [his] offense and prior conduct would raise serious questions involving his liberty interest in parole." *Biggs*, 334 F.3d at 916.  "A continued reliance . . . on an unchanging factor, the circumstance of the offense and conduct prior to imprisonment, runs contrary to the rehabilitative goals espoused by the prison system and could result in a due process violation." *Id.* at 917.

        2.    <u>The State Superior Court Decision</u>

The Santa Clara County Superior Court denied Petitioner's habeas petition, finding that the "totality of the circumstances, (Petitioner's numerous prior crimes, the specifics of the life crime, and Petitioner['s][sic] limited efforts to improve himself and/or show that he has improved himself,) establish that there is 'some evidence' to support the Board's decision in this instance."  (Answer Ex.H.)   The Court relied on *In Re Dannenberg*, 34 Cal.4th 1061 (2005) and *In Re DeLuna,* 126 Cal. App. 4th 585 (2005) in finding that, under a deferential standard of review, the Board's decision was supported by some evidence in the record.

Because the Superior Court is the highest state court to address the merits of Petitioner's claim in a reasoned opinion, this Court looks to its decision to decide whether it was contrary to, or involving an unreasonable application of, clearly established federal law.  *See LaJoie*, 217 F.3d at 669 n.7.

        3.    <u>Denial of Parole Based on Some Evidence</u>

Petitioner claims that BPH's denial of parole is not supported by any reliable evidence of his dangerousness and is, therefore, a violation of due process.  Because the BPH had some evidence to support its findings that Petitioner's commitment offenses

1    were calculated, the motive for them was trivial, they involved an escalating pattern of

2    criminality, and that Petitioner had failed to adequately program or develop sufficient

3    insight into his substance abuse problem, all of which were indicative of his current

4    dangerousness, Petitioner's claim must fail.

5           The BPH had some evidence to support its findings that Petitioner needed further

6    programming "in order to understand and cope with stress in a non-destructive manner in

7    order to build tools for successful parole.  And in order to be able to continue his

8    sobriety on the outside." (Answer Ex. A at 61.)  Specifically, Petitioner had only

9    committed himself to AA as recently as two years before the 2005 hearing and there was

10   evidence before the BPH that he lacked adequate insight into his criminal behavior and

11   the possibility of relapse to prevent him from being a danger to others upon his release

12   from an institutional setting.

13          These facts provide some evidence to support the BPH's finding of Petitioner's

14   current dangerousness.  The findings regarding Petitioner's criminal record, the

15   callousness of his crimes, as well as his institutional behavior and lack of insight

16   constitute some evidence which "rationally indicate[s] that [he] will present an

17   unreasonable public safety risk if released from prison."  *Scott*, 133 Cal. App. 4th at 595.

18   It was not irrational for the BPH to conclude that a prisoner who had such an extensive

19   criminal history and a lengthy disciplinary record within the prison system continues to

20   pose an unreasonable risk to society, given his quite recent behavioral gains and lack of

21   adequate insight into his own behavior and drug abuse.

22          The question before this Court is not whether BPH properly weighed the evidence

23   before it; the question is whether there was "some evidence" to support the BPH's denial

24   of parole.  *Sass*, 461 F.3d at 1128.  It is not up to this Court to "reweigh the evidence."

25   *Powell v. Gomez*, 33 F.3d 39, 42 (9th Cir. 1994).

26          Because BPH's denial of parole was supported by some evidence, the Santa Clara

27

28
                                            13

County Superior Court decision upholding the BPH's parole denial was not contrary to, or an unreasonable application of, clearly established federal law. *See Williams*, 529 U.S. at 411; 28 U.S.C. § 2254(d). Therefore, habeas relief is not warranted on this claim.

6.     <u>Equal Protection Claims</u>

Petitioner also argues that the BPH's "weighing process, not standardized, is an equal protection violation." However, Petitioner's argument fails.

"The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 439 (1985) (quoting *Plyler v. Doe*, 457 U.S. 202, 216 (1982)); *Thornton v. City of St. Helens*, 425 F.3d 1158, 1168 (9th Cir. 2005) (evidence of different treatment of unlike groups does not support an equal protection claim).

The Equal Protection Clause of the Fourteenth Amendment does not assure uniformity of judicial decisions or immunity from judicial error; otherwise, every alleged misapplication of state law would constitute a federal constitutional question. *See Alford v. Rolfs*, 867 F.2d 1216, 1219 (9th Cir. 1989) (citing *Beck v. Washington*, 369 U.S. 541, 554-55 (1962)); *see, e.g., Little v. Crawford*, 449 F.3d 1075, 1083 (9th Cir. 2006) (petitioner cannot establish equal protection claim warranting habeas relief simply because, or if, the Nevada Supreme Court misapplied Nevada law or departed from its past precedents). Here, Petitioner's assertion that the BPH's weighing process is not standardized does not establish an equal protection violation. Therefore, habeas relief is unwarranted on his claims.

**CONCLUSION**

For the reasons set forth above, the petition for a writ of habeas corpus is

14

1

DENIED.  The Clerk shall enter judgment in favor of Respondent and close the file.

2

IT IS SO ORDERED.

3

DATED: September 8, 2009

4

_____
JEFFREY S. WHITE
United States District Judge

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

15

UNITED STATES DISTRICT COURT

FOR THE

NORTHERN DISTRICT OF CALIFORNIA

CONLEY E. DUKES,

             Plaintiff,

  v.

SAN QUENTIN STATE PRISON et al,

             Defendant.

_____/

Case Number: CV06-05741 JSW

**CERTIFICATE OF SERVICE**

I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Northern District of California.

That on September 8, 2009, I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office.

Conley E. Dukes
C70918
San Quentin State Prison
San Quentin, CA 94964

Dated: September 8, 2009

*Jennifer Ottolini*

Richard W. Wieking, Clerk
By: Jennifer Ottolini, Deputy Clerk